UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LLOYD RAJCOOMAR,

                Plaintiff,        COMPLAINT  JUDGE BRIEANT

-against-             Docket No.:

WAL-MART STORES EAST, L.P.,      06 CV 6835

                Defendants.
------------------------------------------------------------------X

Plaintiff, Lloyd Rajcoomar, by his attorneys JACOBOWITZ & GUBITS, LLP hereby complains of the Defendant as follows:

**THE PARTIES**

1. Plaintiff (hereinafter "" or "Plaintiff"), is an individual with a residence in Middletown, New York, County of Orange.

2. Upon information and belief, Defendant, Wal-mart Stores East, L.P. (hereinafter "Walmart" or "Defendant") is a foreign limited partnership authorized to do business under the laws of the State of New York, with places of business at 250 Route 59, Suffern, New York 10901 and Route 300, Newburgh, New York with a corporate headquarters at 425 West Capitol Avenue, Suite 1700, Little Rock, Arkansas 72201.

**JURISDICTION AND VENUE**

3. This action arises under 42 U.S.C. § 2000e et seq. and supplemental jurisdiction over New York State Executive Law §296 et al.

4. This Court has jurisdiction over the subject matter of this action pursuant to 28

1

U.S.C. § 1331 and 1337.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b).

6. Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission on September 19, 2005 claiming discrimination on the basis of race, color, national origin and retaliation. Plaintiff filed a Supplemental Charge on January 31, 2006. Plaintiff was received a Right to Sue Letter on June 15, 2006 and has timely commenced this action within ninety (90) days thereof.

## STATEMENT OF FACTS

7. Plaintiff is a dark-skinned individual and was employed as a Loss Prevention Officer. While his duties varied, generally the Plaintiff was responsible, directly or indirectly, for store security.

8. Following Plaintiff's hire on September 25, 2001, Plaintiff had observed disparities in treatment of minority individuals by the Defendant. This included treatment both towards employees as well as customers. Towards customers, there was a higher degree of scrutiny and security monitoring towards minority shoppers who would enter the store. Similarly, minority employees were subjected to disparities in evaluation, treatment and promotion. Plaintiff claims one of the primary motivations concerning such disparities was to create pretextual disciplinary histories so as to prevent promotion of Plaintiff, Anthony McLeod and other minorities to higher level positions. Instead, non-minority individuals, with less experience and/or seniority would be promoted. This included circumstances where such non-minorities engaged in the same activities as those of minority individuals, but were neither

2

disciplined nor "written-up".

9. Plaintiff had complained, on several occasions, to Walmart management and later the United States Equal Employment Opportunity Commission of discrimination towards himself and others. This included racial profiling, disparities in treatment, performance recognition, promotion and discipline based upon color and/or national origin. Defendant subsequently terminated Plaintiff on November 9, 2005 as a result of discrimination and in retaliation of his complaints thereof.

10. Plaintiff was first employed by Defendant on September 25, 2001 in a store located in Suffern, New York. He was thereafter assigned to training in the store at Centereach, Long Island. While at training in October 2002, a remark was made by a non-minority store detective in a round-table training discussion that when the detective sought to increase apprehension statistics, he would "watch the Mexicans". The Training Managers present laughed and did not make any corrective statements. Plaintiff complained together with Jason Smith and Anthony McLeod of customer racial profiling to Human Resources Manager Kevin Stover. Mr. Stover referred plaintiff to Jamie Newell, Regional Loss Prevention Manager. Mr. Newell laughed as well and stated "why would you consider it racial profiling when there are nothing but Mexicans there anyway."

11. Though no action toward this detective was taken, nor instruction against racial profiling, Plaintiff and co-worker Anthony McLeod suffered retaliation in the form of increased performance scrutiny and disparities in shift and work assignments thereafter.

12. During employment, Plaintiff believes both himself, as well as other minority individuals, were eligible for promotion. However, non-minority management would impose

3

disparities in scrutiny so as to obtain a pretextual justification to discipline minority individuals. This would result in the training and/or promotion being directed to a non-minority individual less experienced and less qualified. Beyond Plaintiff, these circumstances also included another minority individual by the name of Anthony McCloed.

13.     Plaintiff had been eligible for a promotion but instead was denied despite being the best qualified individual. Defendant's non-minority management would create pretextual reasons claiming performance deficiencies such as a "bad bust" in order to develop pretextual written criticism that would then be placed in the employee's file and preclude training or promotion. This pretextual criticism would be used not only to prevent a minority individual from being promoted but also create reasons for subsequent termination.

14.     During the length of his employment, Plaintiff performed his duties and responsibilities in an exemplary manner according to the policies, procedures and guidelines maintained by Defendant. Wal-mart policies require an individual to receive training after which they are promoted to available positions. Though Plaintiff was qualified for promotion, as hereinafter described, by virtue of experience, training and seniority he was never referred to the required training by virtue of the discrimination and retaliation detailed hereafter.

15.     Commencing in early 2003, Plaintiff was eligible for promotion to District Loss Prevention Supervisor positions which were instead assigned to non-minorities. Similarly, Plaintiff was eligible for promotion to Assistant Manager's positions which also were assigned non-minorities.

16.     In December 2002, Plaintiff assisted a non-minority Support Manager, Stephanie Maher to locate her lost store keys. Unless found, the entire store would need to be "re-keyed"

and Ms. Maher would be subject to termination. She advised Plaintiff she intended to blame the loss "on the black guys", including Lenny Mitchell and Ian Artist. Plaintiff complained to Manager Graig Winkler and Micah Hawk. Upon information and belief, non-minority officers or Managers were not questioned. Mr. Hawk subsequently suspended Messrs. Mitchell, Artist *and* Plaintiff. Plaintiff was deprived of his badge and keys. Plaintiff and the other minorities were cleared after the keys were subsequently located. Plaintiff complained of such discriminatory conduct to Supervisor Jamie Newall who was "training" Mr. Hawk. Plaintiff thereafter was transferred and Mr. Hawk advised Plaintiff he would tell Plaintiff's next supervisor that Plaintiff had been accused despite such being unfounded.

17. Plaintiff was thereafter transferred to the Defendant's premises in Fishkill, New York. In April 2003, Plaintiff was successful in retrieving a lost infant, foiling a possible kidnaping. Instead of recognition, Plaintiff was pretextually criticized by his supervisor District Manager Chad Affronti.

18. Approximately one month later, Plaintiff and three (3) non-minority co-workers were temporarily assigned to a New Jersey store. While there, District Supervisor Affrunti showed a white supremacy movie entitled "American History X" to Plaintiff and Plaintiff's non-minority co-workers. Such movie included racial epithets and violence towards minorities, particularly blacks. Mr. Affrunti laughed at such displays and mocked the victims, encouraging others to do the same. Plaintiff objected directly to Supervisor Affrunti to both the movie and conduct to no avail. However, due to the retaliation, Plaintiff previously suffered after complaining of discrimination, he did not immediately report same.

19. A few days after such incident, District Supervisor Affrunti issued written

5

discipline toward Plaintiff concerning the prior infant recovery. Plaintiff immediately objected to the Divisional Loss Prevention Director Renee Norton of both the pretextual discipline and District Manager Affrunti's conduct involving the white supremacy film. Though the discipline was withdrawn, and Affrunti admitted to his conduct during the film, no further action was taken.

20. Following Plaintiff's complaint, an investigation was commenced by District Supervisor Affrunti claiming Plaintiff was "fraternizing" with female associates he supervised. Though Plaintiff had not been advised of such "investigation", female associates approached Plaintiff advising that District Supervisor Affrunti was pressuring such associates to issue false statements, to which they objected. Upon information and belief, one of the associates complained to Affrunti's superior, Tracy Fleming, after which the investigation was ended.

21. Supervisor Affrunti's efforts to create pretextual criticism did not end. In August 2004, Plaintiff called a Manager after advising a non-minority associate, Rob Dorsey, was stealing by eating food items for sale while working (known as "grazing"). An Assistant Manager (Steve Kovekowski - non-minority) later that week advised Plaintiff to be careful as he overheard District Supervisor Affrunti (non-minority) and Assistant Manager Stephen Forshay, talking about how they were going to fire Plaintiff for making a purported "bad apprehension" and solicited Steve Kovekowski if he wanted to help. Instead Mr. Koveleowski told Plaintiff to look at an office file which contained two (2) e-mails sent to Affrunti from two (2) different managers. In one e-mail written by Stephen Forshay marked August 21, 2004 it was claimed Plaintiff had accused Rob Dorsey of "shoplifting", which requires leaving the store. Consistent with the warning, no action was taken towards Dorsey and instead Plaintiff was criticized as

making a "bad stop".

22.   Plaintiff advised Affrunti that he was being inconsistent and discriminatory in his decision making. Plaintiff gave an example where a black associate named "Reggie" had an empty package in his hand and a camera in the other and without reason, Loss Prevention Detective Tom Huestis (non-minority) brought him to the manager's office and falsely accused him of attempted theft. Affrunti replied that the situation was completely different, though Affrunti advised Plaintiff he would not be disciplined. However, Plaintiff was subsequently advised that Dan Golden (non-minority) and the Store Manager, Robert Williams (non-minority) were going to discipline Plaintiff for the incident to which Plaintiff again objected stating such was both discriminatory and retaliatory.

23.   In contravention to his statements to Plaintiff, Plaintiff observed Affrunti send the disciplinary write-up via e-mail to the home office. Plaintiff requested a copy of the write-up to which Affrunti refused in violation of Human Resources policies.

24.   On September 6, 2004, Plaintiff approached the People Manager Brenda Metz and asked for a copy of the write-up. Ms. Metz looked at Plaintiff's file and claimed the discipline wasn't in the system. Plaintiff accompanied Ms. Metz as she approached Store Manager Robert Williams asking him to give Plaintiff a copy of the write-up. The Store Manager replied "we never disciplined Lloyd, we just talked about company policy with him, that's all". However, the discipline remained.

25.   Plaintiff called Loss Prevention Divisional Director Renee Norton once again who informed Plaintiff that Micah Hawk was "investigating" Plaintiff's complaint. Plaintiff replied "Micah Hawk?" and she replied "oh yes, he's your boss again, he transferred to our region and he

7

is overseeing personnel as the Regional Human Resources Manager". Plaintiff advised he previously complained of discrimination against Mr. Hawk. Plaintiff then advised he had evidence of disparities, including a write-up an associate in the same situation as himself which was neither "investigated" nor disciplined. As stated previously, the Loss Prevention Detective was Manager Affrunti's friend, Tom Huestis (non-minority). Human Resource Manager Norton then threatened to discipline Plaintiff claiming that he had taped the conversation and had a write-up that belonged to another associate. Despite the evidence of discrimination and disparities, Ms. Metz ordered Affrunti to issue discipline approximately two (2) months later on October 25, 2004.

26.　　Affrunti then left the district and a new District Loss Prevention Supervisor named Bruce Browne appointed Mr. Browne was the same supervisor who fired Plaintiff's ex-partner Tony McLeod (minority) for discriminatory reasons. Mr. McLeod had also filed a complaint of discrimination.

27.　　On approximately February 13th, 2005 a customer named Julius Brown came into the store and approached Plaintiff in a violent manner which prompted Plaintiff to contact the local police department in the Town of Newburgh. Plaintiff identified two (2) witnesses who saw the male approach Plaintiff and both witnesses wrote supportive statements of Plaintiff. Police Officer Suarez and Doug Scott arrived and advised the subject to leave. Plaintiff went home for the end of his shift and subsequently received a call from his supervisor, Bruce Browne, who claimed Plaintiff had made a "bad stop". Manager Browne then left an accusatory message on Plaintiff's cell phone message system. Browne later called Plaintiff yelling at Plaintiff on his day off threatening to fire Plaintiff. Browne claimed that instead of being violent, Julius Brown

claimed Plaintiff stopped him for DVD theft and he did not have anything. Plaintiff advised Browne that the information he received was false and Plaintiff obtained a police report which stated why the police were summoned. Browne became irate. Plaintiff subsequently learned Assistant Manager Steve Kovekowski had been solicited by Browne to write a statement claiming he was a witness to Plaintiff's "bad stop". Kovekowski advised Plaintiff he had refused. The purported investigation continued for two (2) months, even though Plaintiff supplied management with witness statements which were ignored. Plaintiff called home office complaining of Browne's behavior and learned that Browne was earlier disciplined for falsifying a report regarding another minority detective named Abraham out of the Monroe, New York store in a similar situation such as Plaintiff. Regardless, the discipline toward Plaintiff continued.

28. In approximately March or April 2005, Plaintiff obtained a statement from Robert Jennings (non-minority), a Walmart cashier who approached Plaintiff to advise him that the Store Manager Shawn Alvord and Investigating District Manager Mike Barnum demanded he write a statement against Plaintiff claiming that Plaintiff had known Julius Brown personally. Plaintiff faxed Mr. Jennings's statement to the Divisional Loss Prevention Director, Renee Norton. The District Manager James Spencer (non-minority) offered Jennings a promotion in which five (5) minority persons were qualified. Jennings received the promotion and subsequently bragged about his new promotion to other associates. Jennings stated "Yo Jim Spencer came and talked to me and told me that if I retracted my statement and said Lloyd coerced me into writing it, I would get a cash office job and a raise".

29. On April 25, 2005, Regional Loss Prevention Manager Tracy Fleming

9

interrogated Plaintiff in the Newburgh, New York store and advised Plaintiff that Robert Jennings said Plaintiff coerced him into writing that statement. Both Fleming and Store Manager Shawn Alvord advised Plaintiff that he was being disciplined for using the "Open Door" which Walmart policy strictly prohibits retaliation. Fleming and Alvord also issued a memo threatening to fire Plaintiff for recording people. However, Walmart does not have a policy against same which is legal in New York.

30. Plaintiff is aware of discrimination towards others as well. A non-minority Manager Mike Fino called a black customer a "ghetto bitch" and no discipline occurred. Plaintiff also reported Dan Golden (non-minority) for making a "bad stop" accusing a Latin man of theft though no stolen property was found. Plaintiff reported this Manager and subsequently suffered retaliation.

31. The pattern and practice of discrimination directed toward Plaintiff individually and as a member of a minority included without limitation:

    a. considering Plaintiff's race, color and/or national origin when making employment decisions regarding compensation, promotion, discipline;

    b. humiliating, intimidating, and demeaning Plaintiff through inappropriate remarks about race;

    c. making significant employment decisions based on race and/or national origin;

    d. failing to promote minorities for management positions;

    e. creating a racially hostile work environment;

    f. retaliating against Plaintiff for raising complaints of discrimination.

32. Defendant discriminated against Plaintiff concerning the terms, conditions and

privileges of employment. Defendant treated white and light skinned employees better than employees of color. Defendant administered evaluation, criticism and discipline on a discriminatory basis. In addition, white and light skinned employees were given access to benefits and privileges of employment including but not limited to information, equipment, car service, working hours, department dinners, and expense reimbursement, whereas these same benefits and privileges of employment were denied to black employees and other people of color.

33. As a result of the Defendant's reckless, willful, malicious and/or intentional discriminatory conduct towards Plaintiff, Defendant intended to cause and did cause Plaintiff duress, emotional distress and psychological injury.

### FIRST CLAIM FOR RELIEF ON BEHALF OF PLAINTIFF

34. By reason of the foregoing, Defendant has violated Civil Rights Laws 42 U.S.C. §2000e et seq.

35. The discriminatory, harassing, reckless, wrongful, willful and malicious treatment of the Plaintiff by the Defendant because of color, race and/or national origin and the denial of equal opportunity, terms, conditions, and perquisites of employment were in violation thereof.

36. As a result of Defendant's discriminatory, harassing, reckless, unlawful, wanton and malicious conduct Plaintiff suffered emotional and economic damage.

37. By reason of Defendant's conduct, Plaintiff is entitled, but not limited to back pay, compensatory damages, punitive damages, reinstatement, damages for emotional distress, attorney's fees, costs and disbursements or any other remedy to which he may be entitled.

### SECOND CLAIM OF RELIEF ON BEHALF OF PLAINTIFF

38. Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth

herein in full.

39. By reason of the foregoing, the discriminatory treatment of Plaintiff by Defendant was due, in whole or in part, to race, color and/or national origin, in violation of the Human Rights Law of the State of New York §296 et seq.

40. The discriminatory, harassing, reckless, wrongful willful and malicious treatment of the Plaintiff by Defendant because of national origin, and the denial of equal opportunity, terms, conditions, and perquisites of employment were in violation thereof.

41. As a result of Defendants discriminatory, harassing, reckless, unlawful, wanton and malicious conduct Plaintiff suffered emotional and economic damage.

42. By reason of Defendant's conduct, Plaintiff is entitled, but not limited to back pay, compensatory damages, reinstatement, damages for emotional distress, costs and disbursements or any other remedy to which he would be entitled.

### THIRD CLAIM OF RELIEF ON BEHALF OF PLAINTIFF

43. Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth herein in full.

44. By reason of the foregoing, Defendant has retaliated against Plaintiff and violated Civil Rights Laws 42 U.S.C. §2000e et seq.

45. The harassing, reckless, wrongful, willful and malicious treatment of the Plaintiff by the Defendant for making a complaint of discrimination, objecting to discriminatory conduct; participating in a claim of discrimination and being a witness to discrimination; and the denial of equal opportunity, terms, conditions, and perquisites of employment is retaliation.

46. As a result of Defendant's harassing, reckless, unlawful, wanton and malicious

retaliatory conduct Plaintiff suffered emotional and economic damage.

47. By reason of Defendant's retaliatory conduct, Plaintiff is entitled, but not limited to back pay, compensatory damages, punitive damages, reinstatement, damages for emotional distress, attorney's fees, costs and disbursements or any other remedy to which he would be entitled.

### FOURTH CLAIM FOR RELIEF ON BEHALF OF PLAINTIFF

48. Plaintiff repeats and realleges each of the foregoing paragraphs as if set forth herein in full.

49. By reason of the foregoing, the discriminatory treatment of Plaintiff was due, in whole or in part, to retaliation, in violation of the Human Rights Law of the State of New York §296 et seq.

50. The harassing, reckless, wrongful willful and malicious treatment of the Plaintiff by Defendant, and the denial of equal opportunity, terms, conditions, and perquisites of employment were retaliatory for Plaintiff having engaged in protected conduct or being a witness thereto.

51. As a result of Defendant's harassing, reckless, unlawful, wanton and malicious retaliatory conduct Plaintiff suffered emotional and economic damage.

52. By reason of Defendant's retaliatory conduct, Plaintiff is entitled, but not limited to back pay, compensatory damages, reinstatement, damages for emotional distress, costs and disbursements or any other remedy to which he would be entitled.

### JURY DEMAND

Plaintiff demands a trial by jury.

**WHEREFORE,** plaintiff demands judgment in his favor and against the defendants for all wages, other compensation and lost benefits through the time of judgment, for compensatory damages, for lost pension benefits, for emotional distress, for the reasonable attorney's fees incurred in the prosecution of this action, for punitive damages, for the costs of this action to be taxed against the defendants, and for such other relief as the court deems appropriate.

_____
LLOYD RAJCOOMAR

Sworn before me this 5th
day of September, 2006.

_____
Notary Public

MARINA VALVERDE
Notary Public, State of New York
County of Orange
No. 01VA5083148
Commission Expires August 4, 2009

Dated: September 5, 2006
      Walden, New York

 

_____
Joseph J. Ranni, Esq. (JR-8537)
Jacbowitz & Gubits LLP
Attorneys for the Plaintiff
158 Orange Avenue
P.O. Box 367
Walden, NY 12586
(845) 778-2121

Docket #

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES BACCHUS,

Plaintiff,

against

WAL-MART STORES EAST, LLP,

Defendant.

SUMMONS and COMPLAINT

McGROWNS & OSBURN LLP,
Attorneys for the Plaintiff
1/Orange Avenue
P.O. Box 305
Walden, N.Y. 12586
(845) 778-5151